**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                    )
DANIEL WALKER and ROBERT PISKADLO,  )
on behalf of themselves and all     )
others similarly situated,          )
                                    )
                Plaintiffs,         )
                                    )        Civil Action
v.                                  )        No. 17-10416-PBS
                                    )
OSTERMAN PROPANE LLC and VINCENT    )
OSTERMAN,                           )
                                    )
                Defendants.         )
_____     )

**MEMORANDUM AND ORDER**

October 21, 2019

Saris, C.J.

**INTRODUCTION**

Osterman Propane LLC ("Osterman") is a propane delivery company with eleven branches in Massachusetts. Daniel Walker and Robert Piskadlo ("Plaintiffs") are former employees of Osterman. Plaintiffs filed a class action complaint alleging that Osterman underpaid its propane delivery drivers in violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149 § 148. They seek to certify a class of "all current and former propane delivery drivers in Massachusetts employed by Osterman Propane from February 4, 2014 through the present."

Plaintiffs put forth two theories for why they and other putative class members have been systematically underpaid by

1

Osterman. First, they allege that Osterman automatically deducted a half-hour lunch break from drivers' reported time, even though Osterman knew or should have known that drivers did not always take a break. Second, Plaintiffs argue that drivers are not fully relieved of work duties during ostensible lunch breaks and so should always be paid for that half hour.

After hearing, the Court **ALLOWS** Plaintiffs' motion for class certification (Dkt. No. 112) based on their second theory of liability only.

**FACTUAL BACKGROUND**

## I.   The Parties

Osterman is primarily a propane delivery company formerly owned by Vincent Osterman. There are eleven Osterman branches throughout Massachusetts: Adams, Ashburnham, Bridgewater, Lee, Methuen, Northbridge, Palmer, Southbridge, Sterling, Sunderland, and Taunton. Osterman describes its business model as "decentralized" and "branch-based." Dkt. No. 122 at 6. The company touts one of its strengths as "flexibility" due to "few standard policies." Dkt. No. 113-6 at 12.

Named plaintiff Daniel Walker was a delivery driver employed at Osterman's Methuen branch from January 5, 2015 to September 21, 2016. The second named plaintiff, Robert Piskadlo, worked as a delivery driver and then service technician also in the Methuen branch from November 14, 2012 to September 1, 2017.

## II.  Osterman's Company Policies and Practices

### a. Hours and Timesheets

Osterman's propane delivery drivers are typically scheduled for eight-and-a-half hour shifts from 7:00 am to 3:30 pm, Monday through Friday. Drivers are paid one-and-a-half times their regular rate for all hours worked in excess of forty hours per week. From October to April, which is the "busy season" for propane delivery, drivers often log overtime hours by working longer than their assigned shift or working on the weekend.

Drivers report their hours on timesheets, which they complete at the end of each day and submit weekly to their branch manager. Each branch provides its own timesheets. Except for a period in which the Methuen branch used punch cards to corroborate drivers' time in and out, drivers complete their timesheets on the honor system. The branch manager reviews the timesheets and then a designated person at each branch — often also the manager — manually inputs the hours into the company's payroll system, Workday. Osterman's Employee Handbook instructs employees to consult their branch managers about their hours and how to complete their timesheets.

### b. Meal Break Policies and Practices

Plaintiffs contend that Osterman has an unwritten but company-wide policy to automatically deduct half an hour from a driver's reported hours even when the driver does not take a

lunch break. Plaintiffs present sample timesheets from ten of the eleven branches that contain text across the top, "LUNCH HOURS ARE DEDUCTED." Dkt. No. 113-23. A timesheet from the remaining branch contains text at the bottom reading: "Lunches will be deducted unless you indicate 'No Lunch' on time sheet. 'NO LUNCH' must be pre-approved by manager." Id. at 11.

The record reflects that the different branches handled lunch breaks in various ways. Timesheets are inconsistent across and within branches during the class period. For example, one timesheet from the Ashburnham branch states only "LUNCH HOURS ARE DEDUCTED" while another from the same branch contains the additional text, "UNLESS YOU INDICATE 'NO LUNCH' ON TIME CARD." Dkt. Nos. 113-10 at 4; 113-23 at 5. Two additional timesheets from unspecified branches do not reference a deduction at all.

Drivers had mixed experiences reporting that they had worked through lunch. The record suggests some drivers were able to report they had not taken a break simply by leaving the lunch column blank. In the timesheets for Lee driver Todd Beaudin and Southbridge driver Jeff Langeum, the driver neither indicated a lunch break nor wrote "No Lunch." The totals on those timesheets reflect no deduction of time for a lunch break.

Other drivers had to affirmatively write "No Lunch" or another similar indication. Drivers at the Sterling and Northbridge branches said they routinely marked "No Lunch" days

and were paid with no deduction. The record contains timesheets with "No Lunch" indications from all but one branch that are accurately reflected in corresponding Workday records. These include timesheets from both named plaintiffs, who wrote "No Lunch" on several occasions and were paid accordingly.

But some drivers were unable to report "No Lunch" when they had not taken a break. The named plaintiffs, who were drivers at the Methuen branch working under branch manager Mike Smith, reported that Smith discouraged drivers from writing "No Lunch" during the regular work week. Dkt. Nos. 120-27 at 12 ("At one point, some of us wrote 'no lunch' on some of our timesheets and [Smith] rejected them and made us cross them off and submit them again the right way, as he called it."); 113-1 at 11 ("[Smith] would yell at us and say, 'You guys are nickel and diming me. I give it all back to you in the summer, whatever you think you're missing out on in the winter.'"). Two other drivers at the Methuen branch had similar experiences. Dkt. Nos. 113-21 at 5 ("I almost never took the lunches, but we were supposed to write them down as we did."); 113-14 at 20 ("[Smith] said they deduct a half hour lunch, but there was never any time to take lunch.")

Drivers at other branches were also unable to write "No Lunch" on their timesheets. One driver from Adams testified that his manager told him, "you can't write that you didn't take a lunch on there; you have to take your lunch, even if you don't

have time for it." Dkt. No. 113-13 at 8. In Ashburnham, lunch was also deducted whether the driver took a break or not. One driver said he therefore marked his end time each day as half an hour later than he left, so the total hours after the deduction still reflected his actual hours worked.

Osterman's corporate representative testified: "There is not a standardized meal break policy." Dkt. No. 113-3 at 14. Employee handbooks for the relevant period contain no policies or instructions regarding lunch breaks.

Instead, each manager developed their own practices. Mike Smith, the Methuen branch manager, testified that he did nothing to ensure lunch breaks were taken or recorded, relying on the driver to take the break and report it. If a driver did not write "No Lunch," Smith assumed a break was taken and deducted half an hour by manually entering a break from 12:00-12:30 pm into the Workday system. Other managers expressly made lunch breaks optional in the busy season and instructed drivers to mark "No Lunch" if the driver chose to work through. By contrast, branch managers at the Bridgewater and Lee branches reported that unless a driver made an <u>affirmative</u> indication of a lunch break, no break was deducted.

Other branch managers made lunch breaks mandatory. For example, the Ashburnham branch manager instructed drivers to always take a lunch break and to simply complete their shift

6

later, with overtime as appropriate. The Palmer branch manager similarly denied requests to skip lunch based on his understanding that breaks were mandatory.

## III. **Safety Training and Regulations**

Prior to starting with Osterman, all drivers must have a commercial driver's license ("CDL") with a hazardous materials ("Hazmat") endorsement. After their hire, drivers must also take part in Certified Employee Training Programs ("CETP training"). Drivers from all branches attend a centralized CETP training at an Osterman office, run by an Osterman trainer. The CETP training covers rules and regulations regarding propane delivery and safety. A driver is not allowed to do anything during a break that would be "in violation of the CTEP [sic] training." Dkt. No. 113-3 at 17.

The parties agree that, under federal law, propane is a Division 2.1 flammable material and not a Division 1 explosive material. See 49 C.F.R § 173.115. By regulation, propane truck drivers are required to maintain a 100-foot unobstructed view of their vehicles when they are on a public street or highway, or on the shoulder of a public highway. 49 C.F.R. § 397.5(c). However, propane delivery vehicles do not need to be "attended at all times," as they would if transporting an explosive material. 49 C.F.R. § 397.5(a).

Nonetheless, multiple drivers understood they were required to remain within a certain distance — most commonly, 100 feet — and line of sight of their propane delivery vehicle during lunch breaks. Drivers understood these obligations to arise from several different sources; some cited "federal law," others cited "[Department of Transportation (DOT)] regulations," and another cited instruction from the Department of Homeland Security at his interview for his Hazmat endorsement. Dkt. Nos. 113-1 at 13; 113-2 at 12; 113-17 at 7; 113-20 at 6-7.

Drivers also gave different responses when asked where they had been taught these restrictions. One driver, in the Sunderland branch, received instructions from his branch manager. Three drivers testified that the physical distance and line-of-sight requirements were covered in the CETP training.

Other drivers testified they did not receive those instructions in CETP training or from Osterman. Dkt. Nos. 113-18 at 5 (Q: "Did CETP training address in any way where you could park your truck?" A: "Not really."); 113-21 at 7 (Q: "But did anyone at Osterman tell you you can't leave the truck during a meal break?" A: "No. I mean, we all take HAZMAT. We have endorsements on our license. You take that test. You know this already.") According to another driver, the CETP trainers told drivers regarding parking rules: "You all have CDL licenses. You know the laws." Dkt. No. 113-2 at 12.

Not all drivers believed they were subject to a physical distance or line-of-sight requirement. Some drivers used their lunch breaks to run personal errands, including going to Wal-Mart or the bank. At least nine additional drivers wrote in declarations that they felt free to use their lunch breaks as they pleased with no restrictions.

Osterman's Director of Safety and Training wrote in an affidavit, "CETP training does not include any requirement for propane delivery drivers to keep Osterman's trucks within their lines of sight at all times or within a certain number of feet from their bodies." Dkt. No. 120-67 ¶ 10. Osterman's Hazardous & Emergency Security Plan provides, "No company vehicle shall be left unattended until the driver is satisfied that the vehicle is secure from moving." Dkt. No. 113-24 at 10 (emphasis added). It continues, "drivers are expected to park in safe, well lit, designated truck parking locations only (such as reputable truck stops or high-traffic, major rest areas)." Id. at 11.

## MOTION FOR CLASS CERTIFICATION

### I.   Legal Standard

On a motion for class certification alleging violations of the Massachusetts Wage Act, the Court employs the "conventional class certification analysis under Fed. R. Civ. P. 23." Garcia v. E.J. Amusements of N.H., Inc., 98 F. Supp. 3d 277, 283 (D. Mass. 2015). Plaintiffs "bear[] the burden of 'affirmatively

demonstrating . . . compliance' with the Rule 23 requirements."
In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015)
(quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013)).

A proposed class must satisfy four requirements under Rule
23(a): (1) "the class is so numerous that joinder of all members
is impracticable" (numerosity); (2) "there are questions of law
or fact common to the class" (commonality); (3) "the claims or
defenses of the representative parties are typical of the claims
or defenses of the class" (typicality); and (4) "the
representative parties will fairly and adequately protect the
interests of the class" (adequacy). Fed. R. Civ. P. 23(a).

The proposed class must also satisfy at least one provision
of Rule 23(b). For a proposed class under Rule 23(b)(3), like
the one here, Plaintiffs must show that: (1) "questions of law
or fact common to class members predominate over any questions
affecting only individual members" (predominance); and (2) "a
class action is superior to other available methods for fairly
and efficiently adjudicating the controversy" (superiority).
Fed. R. Civ. P. 23(b)(3).

Rule 23 contains an additional "implied requirement" of
ascertainability, which "essentially require[s] a putative class
to be ascertainable with reference to objective criteria."
Romulus v. CVS Pharmacy, Inc., 321 F.R.D. 464, 467 (D. Mass.

2017) (quoting William B. Rubenstein, <u>Newberg on Class Actions</u> § 3:1 (5th ed. 2017)).

"A district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." <u>Smilow v. Sw. Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 28 (1st Cir. 2003). If legal or factual premises are disputed at the class certification stage, the Court may "'probe behind the pleadings' to 'formulate some prediction as to how specific issues will play out' in order to assess whether the proposed class meets the legal requirements for certification." <u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d 6, 17 (1st Cir. 2008) (first quoting <u>Gen. Tel. Co. of Sw. v. Falcon</u>, 457 U.S. 147, 160 (1982), then quoting <u>Waste Mgmt. Holdings, Inc. v. Mowbray</u>, 208 F.3d 288, 298 (1st Cir. 2000)).

## II. **Analysis**

Plaintiffs put forth two separate theories for liability under the Massachusetts Wage Act. The Court analyzes each in turn and certifies a class as to the second theory only.

### a. **First Theory of Liability: Automatic Deductions**

Under Massachusetts law, employees are entitled to wages for all hours worked. Mass. Gen. Laws ch. 149 § 148. Plaintiffs assert that Osterman's policy of automatically deducting half an hour for lunch unlawfully deprives drivers of compensation because drivers often work through lunch with no break.

Defendants do not contest that the proposed class meets the ascertainability and numerosity requirements, and the Court agrees those requirements are met.

### i. Ascertainability

Plaintiffs' proposed class of propane delivery drivers in Massachusetts employed by Osterman from February 4, 2014 through the present is easily ascertainable through employment records. See Matamoros v. Starbucks Corp., 699 F.3d 129, 139 (1st Cir. 2012) (finding proposed class of all baristas who worked during the class period "ascertainable under the objective standard of job titles").

### ii. Numerosity

"No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001)). It is uncontested that the proposed class would include over 100 drivers. The Court finds that joinder of all these drivers would be impracticable. Rule 23(a)(1)'s numerosity requirement is met.

### iii. Commonality

To satisfy Rule 23(a)(2)'s commonality requirement, the class claims must depend upon a "common contention" that is

"capable of classwide resolution — which means that
determination of its truth or falsity will resolve an issue that
is central to the validity of each one of the claims in one
stroke." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350
(2011). Questions are common if they can "each be answered
either 'yes' or 'no' for the entire class" and "the answers will
not vary by individual class member." <u>Garcia</u>, 98 F. Supp. 3d at
285 (quotation omitted). Commonality is generally satisfied
where plaintiffs challenge "a system-wide practice or policy
that affects all putative class members." <u>Overka v. Am.
Airlines, Inc.</u>, 265 F.R.D. 14, 18 (D. Mass. 2010) (quoting
<u>Armstrong v. Davis</u>, 275 F.3d 849, 868 (9th Cir. 2001)).

Plaintiffs contend that commonality is met here because
"the claims arise out of a companywide policy or practice" of
automatic deductions for lunch breaks even when not taken.

An automatic meal deduction policy is not illegal on its
face. <u>See</u> <u>Botero v. Commonwealth Limousine Serv. Inc.</u>, No. 12-
cv-10428-NMG, 2013 WL 3929785, at *8 (D. Mass. July 25, 2013)
(noting in a Fair Labor Standards Act case that "automatic meal
deduction policies are not per se illegal" (quotation omitted)).
"To prove . . . a claim [of unlawful meal break deductions]
plaintiffs must demonstrate that [the employer] knew or should
have known that drivers were working during those meal breaks."
<u>Raposo v. Garelick Farms, LLC</u>, 293 F.R.D. 52, 56 (D. Mass.

2013). After a rigorous analysis of the record, the Court concludes that no common question would establish liability on a class-wide basis under this test.

Plaintiffs have not affirmatively demonstrated that Osterman had a company-wide "automatic deduction policy." At least two Osterman branch managers reported that their policy was to deduct a lunch break only if a break was affirmatively recorded. In addition, timesheets from two drivers in the Lee and Southbridge branches show no affirmative indication of "No Lunch" and yet their total hours show no deductions.

Even in branches that automatically deducted a break, the record reflects a wide variety of practices. Some branch managers took steps to prevent uncompensated work by, for example, enforcing mandatory lunch breaks. Other managers allegedly encouraged it by telling drivers to work through lunch but nonetheless mark a lunch break. Drivers at some branches could and did report "No Lunch" days with no apparent discouragement or negative consequence. Drivers at other branches found ways around the deduction policy by extending their hours at the end of the day, thereby receiving compensation for all hours worked.

Branch managers' discretionary decisions regarding lunch breaks preclude a common question of fact as to whether Osterman knew or should have known drivers worked during meal breaks. See

Dukes, 564 U.S. at 356 (holding that a policy of discretion meets commonality only if there is "a common mode of exercising discretion that pervades the entire company"); Romulus, 321 F.R.D. at 470 (denying certification in meal break case where plaintiffs could not show that the challenged policies were uniformly applied in an illegal way). Even Plaintiffs' narrower proposed class of all drivers with "no indication" on their timesheet cannot meet the commonality requirement. There is no common evidence across branches that Osterman deducted lunch breaks not taken when a driver gave "no indication" on a timesheet. The inquiry would be specific to each branch and, in some cases, to each driver.

As a backstop, Plaintiffs contend that Osterman's failure to accurately determine and record when each driver took a break each day is a per se violation of the employer's duty to maintain accurate records. But Osterman did keep timesheets and relied on its employees to fill them out accurately on the honor system. While some branch managers (e.g., in Methuen) likely violated the Wage Act by deducting lunch breaks improperly, there is no evidence this was a company-wide practice.

Even if a branch manager failed to properly check the accuracy of drivers' timesheets, Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946), does not recognize or create a separate cause of action where an employer fails to keep

accurate records. Anderson is concerned with the burden of proof
and calculation of damages where a plaintiff "proves" a wage
violation and "produces sufficient evidence to show the amount
and extent of [uncompensated] work as a matter of just and
reasonable inference." Id. at 687-88. Whether Osterman violated
its duty to keep accurate records does not "resolve an issue
that is central to the validity" of Plaintiffs' claim under the
Wage Act. At best, it could guide the Court's analysis of
damages if an unlawful policy or practice is proven.

Another judge of this court examined a similar set of facts
in Raposo v. Garelick Farms, LLC and denied class certification
based on commonality. In Raposo, plaintiffs were former Garelick
Farms drivers who alleged "they were frequently forced to work
through meal breaks without compensation." 293 F.R.D. at 53. The
court denied certification because "deposition testimony
indicate[d] that not all drivers worked through their meal
breaks" and "among drivers who did actually work through their
breaks, the reasons for doing so vary from driver to driver and
from day to day." Id. at 56. The court continued that "some
drivers who worked through breaks were subsequently compensated
for that time after notifying their supervisor," so "whether
drivers were compensated for working through breaks cannot be
answered either 'yes' or 'no' for the entire class." Id. at 57
(quotation omitted).

Plaintiffs' effort to distinguish Raposo is unavailing. Plaintiffs highlight that, in Raposo, drivers were required to take thirty-minute meal breaks while Osterman had no policy to ensure automatically deducted breaks were taken. But some Osterman branch managers did require drivers to take meal breaks, even if others made meal breaks optional either year-round or during the busy season.

The Court concludes commonality is not met. Plaintiffs have failed to affirmatively demonstrate compliance with Rule 23 as to their first theory of liability.[1]

### b. Second Theory of Liability: Work-Related Duties

Under Massachusetts law, "[w]orking time does not include meal times during which an employee is relieved of all work-related duties." 454 C.M.R. § 27.02. Plaintiffs' second theory of liability is that drivers are entitled to compensation during purported lunch breaks because they are not "relieved of all work-related duties." Specifically, Plaintiffs assert that drivers must remain within a certain distance of their propane delivery vehicle and keep the vehicle in their line of sight.

---

[1] Even if commonality were met, Plaintiffs would be unable to meet Rule 23(b)(3)'s "far more demanding" predominance requirement. See In re New Motor Vehicles, 522 F.3d at 20 (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 624 (1997)). Both liability and damages depend on numerous individualized inquiries that would "inevitably overwhelm questions common to the class." See Comcast, 569 U.S. at 34.

The Plaintiffs propose the same class of all current and former propane delivery drivers in Massachusetts employed by Osterman from February 4, 2014 through the present. The Court's earlier analysis of ascertainability and numerosity remains applicable and is not repeated here.

### i. Commonality

As discussed above, commonality is met where there is a "common contention" that, if true, "will resolve an issue that is central to the validity of each one of the [class] claims." Dukes, 564 U.S. at 350. As to their second theory of liability, Plaintiffs catch a break.

"Wage claims involving system-wide practices or policies are appropriate for class treatment because establishing liability for one employee necessarily establishes liability for the entire class." Garcia, 98 F. Supp. 3d at 286. Relying on depositions from putative class members, Plaintiffs allege that the common Osterman-run CETP training imposes certain restrictions on all drivers during lunch breaks.

Defendants counter that federal law does not require drivers to remain within a certain distance and line-of-sight of their vehicles. Under 49 C.F.R. § 397.5(c), propane delivery drivers must comply with those restrictions only if they are on a public street or highway, or on the shoulder of a public highway. Defendants also point to declarations from drivers who

did not believe they were subject to restrictions during breaks
and to an affidavit from Osterman's Director of Safety and
Training that the CETP training does not include any such
requirements.

Plaintiffs have affirmatively demonstrated a common
question of fact whose answer will "resolve an issue that is
central to the validity" of their Wage Act claim. Dukes, 564
U.S. at 350. Namely, does the centralized CETP training instruct
drivers to abide by physical distance and line-of-sight
restrictions? The answer to this question can be answered "yes"
or "no" on a class-wide basis. Plaintiffs have submitted sworn
testimony by three drivers that they were trained to follow this
practice. To be sure, Defendants also submitted substantial
evidence that refutes these submissions, but the Court cannot
resolve that conflict here. A jury will have to determine the
"truth or falsity" of this common contention about the alleged
centralized training on a class-wide basis.

In addition, Plaintiffs' second theory presents a common
question of law — do the alleged restrictions render drivers'
breaks compensable under the Massachusetts Wage Act? Whether
drivers are considered "relieved of all work-related duties" if
they are subject to the restrictions can be answered "yes" or
"no" on a class-wide basis. The Court expresses no views on the
merits of that legal question at this stage. See Amgen Inc. v.

Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.")

The Court concludes commonality is met.

### ii. Typicality

Rule 23(a)(3)'s typicality requirement is met where "the class representatives' claims have the same essential characteristics as the claims of the other members of the class." Garcia, 98 F. Supp. 3d at 288 (quoting Barry v. Moran, 05-cv-10528-RCL, 2008 WL 7526753, at *11 (D. Mass. Apr. 7, 2008)). "Typicality requires that the named plaintiffs' claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and are based on the same legal theory." DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 404 (D. Mass. 2017) (alterations and quotation omitted).

Walker and Piskadlo are typical class members as to their second theory of liability. The "course of conduct" from which liability would arise is common to all class members — Osterman requires all drivers to attend the same training and comply with the same safety standards. If lunch breaks are compensable under the Wage Act, Walker and Piskadlo have the same claim to recover for deducted breaks as every other class member. The Court concludes that typicality is met.

i.   *Adequacy*

To satisfy Rule 23(a)(4), "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985).

Defendants contend Walker and Piskadlo are inadequate class representatives because they hold grudges against their former manager, Mike Smith, and because they committed timesheet fraud. Neither argument is persuasive. "Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." Matamoros, 699 F.3d at 138 (quotation omitted). Dissatisfaction with a former boss is not a disqualifying conflict where there is no evidence it would affect Plaintiffs' claim regarding lunch breaks.

Neither is the purported "timesheet fraud" a disqualifying conflict of interest. Plaintiffs admit they were sometimes allowed to leave early during the off-season — but mark a full day — to make up for unpaid overtime in the busy season. This situation is a far cry from cases where the named plaintiffs had felony fraud convictions. See Xianglin Shi v. Sina Corp., No. 05

CIV. 2154 (NRB), 2005 WL 1561438, at *4 (S.D.N.Y. July 1, 2005) (collecting cases).

Plaintiffs' attorneys are experienced in class-action employment litigation and specifically wage and hour claims. Defendants do not contest their qualifications. Both prongs of Rule 23(a)(4)'s adequacy requirement are met.

### ii.   Predominance

To succeed in their motion for class certification, Plaintiffs must finally show that the proposed class meets the predominance and superiority requirements of Rule 23(b)(3).

"[A] district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Mowbray, 208 F.3d at 298. "At the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members." In re Nexium, 777 F.3d at 19.

The Court concludes that questions common to the class predominate. Liability can be determined on a class-wide basis, without resort to individualized inquiries. To prevail, Plaintiffs will need to prove that the CETP training instructed all drivers to comply with the alleged restrictions and that, as a legal matter, those restrictions rendered lunch breaks

"working time." Both contentions will stand or fall as to all class members.

Individualized damages questions would not "inevitably overwhelm questions common to the class." Comcast, 569 U.S. at 34. Under Plaintiffs' theory, all lunch breaks would be compensable under the Wage Act. Although individual questions would remain regarding how many lunch breaks were deducted from each driver, it would be feasible to calculate the number of breaks deducted over the course of each driver's employment using Workday records. Because calculation of each driver's damages "will likely be mechanical," individualized damages do not defeat predominance. See Garcia, 98 F. Supp. 3d at 291.

> ### iii.   Superiority

Finally, Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "A Rule 23(b)(3) class action is particularly superior where class treatment can vindicate the claims of 'groups of people whose individual claims would be too small to warrant litigation.'" Id. at 292 (quoting Smilow, 323 F.3d at 41).

The Court finds that a class action here is the superior method for adjudicating this controversy. The Court does not find any significant management issues in proceeding as a class action, and the Court is not aware of any other pending related

litigation. Furthermore, the Court finds that a class action lawsuit would be a better option than multiple individual actions, coordinated individual actions, consolidated individual actions, test cases, or any of the other known options. In particular, the class is composed of individual claims that would likely be too small to warrant litigation.

The requirements of Rule 23(b)(3) are met.

### ORDER

For the foregoing reasons, the Court **ALLOWS** Plaintiffs' motion for class certification (Dkt. No. 112) only as to their theory of liability that drivers are not fully relieved of work-related duties during their lunch breaks. The Court certifies the following class:

> All current and former propane delivery drivers in Massachusetts employed by Osterman Propane from February 4, 2014 through the present.

Plaintiffs' counsel is **APPOINTED** as counsel for the Class.

A status conference will be held on November 4, 2019 at 10:00 am.


SO ORDERED.

                              /s/ PATTI B. SARIS
                              Hon. Patti B. Saris
                              Chief United States District Judge